FILED'10 JAN 29 16:52USDC·ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEFANIE RILEY,

        Petitioner,

      v.

JOSEPH DANIEL GOOCH, TED
DUELL, and BONNIE DUELL,

        Respondents.

Civ. No. 09-1019-PA

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**PANNER, District Judge:**

On December 14-15, 2009, I held an evidentiary hearing in the above matter. After the hearing, I ordered the child returned to Germany. These are my findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

### FACTUAL FINDINGS

In January 2005, petitioner Stefanie Riley ("Riley") and respondent Joseph Daniel Gooch ("Gooch") met in Giessen, Germany where Gooch was stationed in the United States military. Shortly

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

after meeting, Riley and Gooch began to cohabit.  On October 18, 2005, Gooch filed a petition to dissolve his marriage to Celia Sanchez-Gooch in Klamath County Circuit Court ("Klamath Court").[1] On March 21, 2006, the marriage was dissolved.  (Joint Statement of Stipulated Facts, ¶ 10.)  In December 2005, while the above dissolution proceeding was pending, Riley and Gooch participated in a marriage ceremony in Las Vegas, Nevada.  Id. at ¶ 8.  Because Gooch was married to Celia Sanchez-Gooch at the time of his marriage ceremony with Riley, the marriage between Gooch and Riley was void.  Id. at ¶ 12; Nev. Rev. Stat. § 125.290.

I reject Gooch's testimony that he and Riley participated in a second wedding ceremony in Denmark.  Other than his own testimony, Gooch offered no evidence supporting a second ceremony. To believe that Gooch and Riley participated in a second ceremony, specifically because they both knew the first marriage was invalid, yet failed to keep any documentation confirming the ceremony, strains the limits of belief.  Additionally, in Gooch's divorce proceeding against Riley, Gooch makes no mention of any marriage in Denmark, instead stating that he and Riley were legally married in Las Vegas in 2005.  Similarly, on ZVG's Application for Consular Report of Birth Abroad, Gooch listed the 2005 Las Vegas marriage ceremony.  Finally, I find credible Riley's adamant testimony that they never participated in a second ceremony.

---

[1]On September 14, 1993, Gooch married Celia Sanchez in Laguna Nigel, California.

Gooch and Riley returned to Germany and ZVG[2] - the child at issue in this case - was born on July 16, 2007 in Giessen, Germany.  Riley has two sons, aged ten and seven, from previous relationships.  Under the German Civil Code, Fifth title, Parental Custody § 1626a, Riley has "rights of custody" for ZVG.[3]  (Joint Statement of Stipulated facts, ¶ 30.)  On October 1, 2007, Riley and Gooch filed an application for a United States ("U.S.") passport for ZVG.

In December 2007, Gooch received an honorable discharge from the U.S. military.  On December 14, 2007, Gooch, Riley, ZVG, and Riley's two sons flew to the U.S. on one-way tickets provided by the U.S. government.  The government also shipped the majority of the family's belongings to the United States.  Riley left some belongings at her mother's home in Germany.  Although the parties dispute the purpose of the trip, I find that Riley believed the purpose of the trip was to help care for Gooch's grandparents.  While Gooch may have intended to permanently settle in the U.S., I find that Riley intended to return to Germany with her three children 90 days after entering the U.S.

In making this finding, I note that Riley and her children entered the U.S. through the Visa Waiver Program ("VWP").  At the time of the trip, Riley, ZVG, and Riley's sons only held German

---

[2]Because ZVG is a minor, I use only her initials.

[3]Under this code, if the parents are not married upon the child's birth, the mother has sole custody unless the parents subsequently marry or declare they wish to exercise joint custody.  Id.

passports.  As the name entails, the VWP allows foreign citizens
to enter the U.S. without a visa.  The VWP requires all
participants exit the U.S. within 90 days of entrance.[4]  The VWP
also requires each entrant possess a return airline ticket as a
prerequisite to entering the U.S.  Using his grandfather's credit
card, Gooch purchased return tickets to Germany for Riley and the
three children.  Prior to December 2007, Riley had visited the
U.S. on approximately five previous occasions.  On each occasion,
Riley returned to Germany within 90 days of entering the U.S.

The finding that Riley intended to return to Germany within
90 days is collaborated by the credible testimony of Riley's
witnesses.  Riley, Riley's sister Annette Meyer ("Meyer"), Riley's
lifelong friend Jasmin Hoover ("Hoover"), and Justin Flanders
("Flanders") - the American father of Riley's oldest son - all
testified convincingly that Riley would never consider living
anywhere other than Germany.  Other than Gooch, no one testifying
on behalf of the respondents could speak with personal knowledge
as to Riley's intent or actions prior to leaving Germany.  Meyer
and Hoover both testified that Riley stated, prior to leaving
Germany in December 2007, that the purpose of the trip was to care
for Gooch's grandparents and that Riley stated she would return to
Germany in 90 days.

///

---

[4]I note Riley's precarious immigration status as it is "a
highly relevant circumstance where, as here, the shared intent of
the parties is in dispute."  <u>Mozes</u>, 239 F.3d 1067, 1082 (9th Cir.
2001).

Additionally, although Riley filled out an application for a
U.S. immigrant visa, she never signed or submitted the
application.  Riley kept her German bank account open, and never
opened a U.S. bank account.  Riley kept her sons enrolled in
Kindergeld - a German equivalent of welfare - receiving a monthly
check of approximately 300 dollars for each enrolled child.[5]  The
payments ended when Riley did not return to Germany within 90
days.  Riley never signed the children up for assistance in the
U.S., although she did attempt, out of absolute necessity, to
obtain food stamps in August 2008.  That said, Riley's older son
attended a California school beginning in January, 2008.  That son
also attended school in Klamath Falls, Oregon from April 4 through
May 27, and June 3 through 12, 2009.

Although Gooch testified that the family plan was to move
permanently to the U.S. and that the family would deal with the
90-day VWP limits after arrival, I do not find his testimony
credible considering the evidence above.  In making this finding,
I also considered the evidence supporting Gooch's position,
including evidence that: the family ended up staying for eight
months; the family shipped most of their personal property to the
U.S.;[6] Riley and Gooch signed a one-year lease on a home in

---

[5]Riley never signed ZVG up for Kindergeld, even though ZVG
was born in, and spent her first five months in Germany.

[6] Although the family did ship the majority of their
belongings to the U.S., I note that the U.S. government provided
a strong incentive for the family to do so.  Holder, 392 F.3d
1009, 1018 (9th Cir. 2004).  Thus, while the shipment of personal
property is not dispositive of the parents' intent, I did
consider that evidence in my findings.

California;  and Riley told the Duells and Gooch's grandparents
that she liked living in the U.S. and wanted to bring other family
members to the U.S.

Upon arriving in the U.S., the family went to Gooch's
grandparents' home in Yucca Valley, California.  Although Riley
believed they would be providing temporary care for Gooch's
grandparents, Gooch never relayed that information to his
grandparents.  Riley's actions upon arriving in Yucca Valley
support this finding.  For example, Riley told the caretaker her
services were no longer needed, and attempted to cook and clean
for the family and Gooch's grandparents.  In short, to the
surprise of Gooch's grandparents, Riley acted as though she was
their caretaker.  This caused some tension between Riley and
Gooch's grandmother.

Gooch's grandparents did not have space for the family and on
December 21, 2007, Riley and Gooch signed a one-year lease for a
rental home in Yucca Valley.  Riley and Gooch rented appliances
and furniture from a rent-to-own company.  Riley and Gooch also
purchased a puppy.  Despite the above facts, Riley's testimony
that she never intended to live in the house for more than 90 days
is credible.  Quite simply, the family had nowhere else to go, and
they needed to live somewhere.  I also consider the fact that
Riley was in a foreign country with no friends, little money,
three children, and return tickets for a flight to Germany in
approximately three months time.  Indeed, Hoover testified that
Riley called her and reported that from her first day in the U.S.,

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Riley was very unhappy and distressed with the entire situation. Further, Riley was, for the most part, economically dependent on Gooch. Finally, Riley testified that she had previously tried to end her relationship with Gooch and that Gooch did not react well. I find credible Riley's testimony that she was somewhat afraid to say "no" to Gooch.[7] I also find that perhaps out of politeness, Riley overstated her happiness at being in the U.S. to Gooch's grandparents and to respondents Ted and Bonnie Duell (the "Duells").

On February 25, 2008, shortly before the 90-day VWP time limit expired, Gooch consulted an immigration attorney regarding the procedures for obtaining U.S. passports for Riley and one of her sons. Gooch testified Riley accompanied him to the attorney. Riley testified she never inquired about, and certainly never visited, an immigration attorney. Other than Gooch's testimony, there is no evidence suggesting Riley visited the immigration attorney. The immigration attorney has no recollection of whether or not Riley attended the consultation. More importantly, Gooch found the attorney and filled out all of the intake forms. Considering all of the above, and that I generally find Riley more credible than Gooch, I find Riley neither inquired about, nor attended the consultation.

Riley, her sons, and ZVG could not leave the U.S. as planned because the return tickets were nowhere to be found. Although the

---

[7]This finding refers solely to Riley's subjective belief regarding giving Gooch bad news.

evidence regarding what happened to the return plane tickets is
unclear, I find Riley's testimony credible that although she
wanted to return to Germany with her children, she had no means of
doing so. Riley testified that she asked Gooch for the tickets
but he refused to provide them. Hoover testified that Riley
called her near this time and stated Gooch would not provide the
return tickets. Riley and Gooch both claim they never physically
possessed the tickets. It is undisputed that Gooch purchased the
tickets using his grandfather's credit card. Riley did not have
the means to purchase tickets herself.

Neither Gooch nor Riley obtained employment in Yucca Valley.
In March 2008, Bonnie Duell flew to Yucca Valley because her
mother - Gooch's grandmother - was ill. Once there, she saw and
spoke to Gooch for the first time in years. Bonnie Duell told
Gooch that his step-father, Ted Duell, might be able to help
secure employment for Gooch in Klamath Falls, Oregon. Riley and
Gooch had not discussed the possibility of moving to Oregon prior
to a few days immediately preceding the move. In late March or
early April 2008, the family moved into the Duell residence in
Klamath Falls, Oregon.

The family left some belongings in California and stored the
rest in one section of the Duell garage. On April 8, 2008, Gooch
began working for the same company the Duells worked for. Gooch
listed the entire family on his enrollment forms for employee
benefits, including health insurance.
///

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The relationship between Riley and the Duells was acrimonious. Among a variety of issues, the Duells claimed Riley drank too much beer while consuming pain medication. Their testimony was not persuasive. Although Riley drank and took pain medication prescribed by her doctors, the evidence does not suggest she abused alcohol or drugs. Further, Riley did not hide her use of pain medication. This was only one issue between Riley and the Duells. Generally, a lot of tension arose from the fact that Riley and the Duells simply did not care for each other.

After approximately two months, the Duells asked the family to move out. In June 2008, the family rented a home from a friend of the Duells. In exchange for one month of free rent, Riley and Gooch performed work on the home. Specifically, in addition to a substantial amount of cleaning, Riley chose the colors, and then painted the interior of the home. I find that the family had very little money and these improvements were motivated by a desire to save on rent. Bonnie Duell agreed to pay 25 percent of the monthly rent. While looking at the house, Gooch, and perhaps Riley, spoke in vague terms about possibly purchasing the home at a later date. In June, Gooch's grandparents brought the personal property and furniture left in California to Klamath Falls.

On July 16, 2008, ZVG spent her first birthday with the Duells. On July 27, Bonnie Duell requested, and Riley and Gooch agreed, that the children should temporarily stay with the Duells. This request was in response to a visit by Bonnie Duell to the family home. The children had no food and very little

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

supervision.  The understanding between all the parties was that while the children were at the Duell home, Riley and Gooch would attempt to work out the problems in their relationship.  After that point, all parties understood the Duells would return ZVG to Riley and Gooch.  Although Gooch visited the children every day, Riley did not visit the children at the Duell residence.

On August 3, 2008, while the children were with the Duells, police were called to an altercation between Riley and Gooch.  As a result of this incident, Gooch moved out of the family home. Riley called Meyer and informed her the Duells would not return ZVG.  Meyer instructed Riley to contact the authorities.  On August 5 or 6, Riley requested help from the authorities in securing ZVG's return.  The authorities informed Riley that since ZVG was currently with Gooch, they were unable to order ZVG's return to Riley.  This testimony is collaborated by Bonnie Duell's testimony that the authorities called her and informed her that Riley stated the Duells had kidnaped the children and demanded "her boys back."  The authorities arranged for Bonnie Duell to drop Riley's sons off at the sheriff's station, where they would be returned to Riley.  ZVG remained with Gooch and the Duells.

On August 7, 2008, Gooch filed an action for dissolution of marriage against Riley in Klamath Court.  Bonnie Duell paid for the divorce, and attended the initial consultation with Gooch and the attorney.  Gooch filed for divorce even though he knew his marriage to Riley was not valid.  In making this finding, I specifically find that Gooch intentionally lied to the Klamath

Court when he stated, in his Petition for Dissolution of Marriage, that he and Riley "were duly and legally married at Las Vegas, Nevada, on December 20, 2005.[8]  (Pet'r's Ex. 9, 3.)

As a result of this filing, the court issued a temporary restraining order, preventing Riley from removing ZVG from either the Duell home or the state of Oregon.  Id. at 12-18.  Although Gooch testified that his motivation for filing for divorce was to protect his assets, I do not find his testimony credible.  As stated above, Riley and Gooch both knew the 2005 Las Vegas marriage was not valid.  I find Gooch's motivation in filing for divorce was to obtain the temporary restraining order preventing Riley from removing ZVG from either the Duell residence or the state of Oregon.  In short, I find that Gooch wanted to begin the custody battle over ZVG in the United States, as opposed to Germany.  Through a server of process, Gooch served Riley on August 14, 2008.  Id. at 19-20.  Included in the service was the temporary restraining order.  Id.  Riley never responded to the divorce proceedings.  On October 3, 2008, Klamath Court entered a General Judgement of Dissolution, giving Gooch custody of ZVG.

On August 8, 2009, the landlord gave Riley notice that rent was seven days past due.  As stated above, Riley was not financially independent.  The monthly Kindergeld payments ended when Riley did not return to Germany after 90 days.  Riley's only source of income was intermittent child support payments from

---

[8]On cross examination, Gooch admitted to not being completely honest with the Klamath Court.

11- FINDINGS OF FACT AND CONCLUSIONS OF LAW

Flanders averaging $250 per month.  Riley had to ask neighbors for food for herself and her sons.  Throughout her time in the U.S., Riley repeatedly asked friends and relatives for money, with little success.

On, or shortly after August 8, Riley and her sons moved into the home of Chuck Polson ("Polson").  Near this time, Riley learned her mother's cancer had progressively worsened.  On August 12, ZVG began attending day care.  I note that Gooch filled out the day care enrollment forms, and although Gooch and the Duells were authorized to pick ZVG up from day care, Riley was not authorized to do so.  (Resp't's Ex. 124, 1.)

I found Polson's testimony extremely credible.  Polson stated Riley told him, at the time, that Gooch and the Duells were not allowing her to see ZVG.  Polson said this distressed Riley greatly.  Polson testified Riley did not want to return to Germany without ZVG, but that Riley's position on leaving changed when her mother's condition worsened.  Maria Clagett ("Clagett") also testified that Riley was very distressed, and that Riley stated she had to return to Germany but would return later for ZVG.  On one occasion, Polson drove Riley to see ZVG but Gooch did not let Riley see ZVG.  Polson advised Riley to return to Germany to get closure with her mother.  After that, Polson told Riley she could come back and get ZVG.

Eventually, Polson bought Riley plane tickets to Germany for herself and her sons.  As stated above, Riley did not have the means to purchase the tickets herself.  On August 27, 2008, Riley

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

returned to Germany with her two sons while ZVG stayed with Gooch and the Duells. Riley's mother passed away six days later.

Although Riley had contact information for Gooch and the Duells, she did not contact them for nearly three months. On November 21, 2008, Riley sent an email to Bonnie Duell, inquiring about ZVG. After receiving a brief update on ZVG, Riley wrote, "I am glad to hear that [ZVG] is doing fine. I truly miss her with all of my heart. It hurts alot [sic] to think about the fact that i [sic] will never see her again." Bonnie Duell responded:

> Well, never is a very long time.[] Just remember, Ted and I will do whatever it takes to protect [ZVG] from any harm ever. Ted and I will always try and make sure she has the very best of everything we can possible give her.[...]Please, just always remember, she is in a very safe and happy home with us. Our whole lives have been put on hold in order to care for [ZVG....]I am so proud of you, that you had the courage to do the right thing for the baby. How are the boys dealing with not having her there with you. I hope they understand that it was something you had to do.[]

(Pet'r's Ex. 21, p 1)

Riley responded by writing:

> Of course, the boys talk about [ZVG] everyday, they do not understand the whole thing, but that is ok, they dont need to worry. i am sure that when [ZVG] gets to a certain age that i will talk to her. and her brothers will talk to her as well. but for the moment there is nothing i want to do that could rip her out of her home right now.

Id. (unless noted, original spelling and punctuation).

Riley testified that she took a friendly tone in the above emails because she did not want to anger Bonnie Duell, as ZVG was living with Gooch and the Duells. Additionally, Riley was going through a very difficult period - economically and emotionally -

13- FINDINGS OF FACT AND CONCLUSIONS OF LAW

and was evaluating her options on securing ZVG's return.
Considering the circumstances, I find Riley's testimony credible.

Despite what Riley told Bonnie Duell, Riley was exploring her
legal options to secure ZVG's return. In January 2009, Riley was
appointed a German legal aid lawyer. On January 27, 2009, Riley's
attorney sent a letter to Gooch and the Duells, written in German,
demanding ZVG's return. (Resp't's Ex. 144,1.)  While that
attorney initiated custody proceedings in a German court, he did
not file a petition under the Convention.

On April 29, 2009, the Duells petitioned for guardianship
over ZVG in Klamath Court. Although never served, Riley did have
notice of the guardianship proceedings as evidenced by the chain
of emails between Riley and Bonnie Duell on April 1 and 2, 2009.
The emails also demonstrate the change in Riley's tone upon
securing legal representation. Bonnie Duell wrote, "I have a huge
favor to ask of you. Ted and I would like to get legal
guardianship of [ZVG]. In order to do this, you would need to
sign legal authorization." Id. at 4.  Riley responded by writing:

A couple days ago Joe wrote me an Email telling me that
it is HIS daughter and that he has custody of her. So my
question is, what do you want from me now? Nobody asked
me to sign anything, you people just stole her. And now
you want my signature? I think it worked out very well
for you guys, without my signature. Why don't you ask
your little sunshine Joe for the signature, since he has
custody?? You know it is all bad enough how it is with
my baby girl, but one day the truth will come out, no
matter how many lies you guys spread about me.

Id. (unless noted, original spelling and punctuation).

Bonnie Duell responded:

I am sorry, [Gooch] is still very angry and bitter

14- FINDINGS OF FACT AND CONCLUSIONS OF LAW

> toward you. But, that is between you and him.. True
> enough, [ZVG] is Joe's daughter, but alto true enough,
> [ZVG] is your daughter as well. Also, true, Joe does
> have full custody of her, by default, because you did
> not contest the divorce. I am so sorry that you feel we
> stole [ZVG] from you..I have to disagree, but that is
> neither here nor there..[..]What I would like from you,
> because she is living with me and Ted[...]is to sign
> guardianship papers for us [so we can get medical and
> dental care for ZVG....]It is not like an adoption,[...]
> it is only so we can keep Joe from removing her from our
> home when he gets mad at me.[...]He has moved out from
> our house, but we still have [ZVG].. We are only trying
> to do what we think is best for now for [ZVG....]It
> isn't necessarily forever,...it is just for now. I dont'
> think I have ever spread any lies about you Stefanie,
> what happened was between you and Joe and I am so sorry
> that all of it happened.[...]I know you love [ZVG], and
> it was very difficult for you to leave her, but we both
> know that at the time it was the best thing to do, and i
> will always admire you for having the inner strength to
> do that.

Id. at 3 (unless noted, original spelling and punctuation).

> Riley responded by writing:

> didn't contest what? a divorce? Do not forget Bonnie,
> that I was never married to him. He was still married at
> the time we went to Vegas. He didn't tell you
> that?...Well well, if you really insist of getting an
> address you can send those papers to, what about an
> address of one of my lawyers?

Id. (unless noted, original spelling and punctuation).

In mid 2009, Riley obtained a new German attorney.

Eventually, Riley was referred to an Oregon attorney, who filed

Riley's Hague petition on August 27, 2009. Riley testified that

she first learned of the Convention in August 2009. As of the

date of the evidentiary hearing, the Duells were ZVG's residential

custodians and primary caregivers. ZVG resided with the Duells

from July 27, 2008 through December 15, 2009. Gooch lived with

the Duells and ZVG from approximately August 3, 2008 through March

15- FINDINGS OF FACT AND CONCLUSIONS OF LAW

2009. After moving out, Gooch maintained his relationship with ZVG. The Duells provided all of ZVG's day-to-day needs except during the hours ZVG spent in a licensed child care facility.

## CONCLUSIONS OF LAW

Adopted on October 25, 1980, the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (the "Convention") is an international treaty establishing procedures for "the prompt return of children wrongfully removed or retained in any Contracting State." Convention, Art. 1(a), 19 I.L.M. at 1501. Congress enacted the International Child Abduction Remedies Act, 24 U.S.C. §§ 11601-11610 to implement the Convention. § 11601(b). Germany and the United States are both signatories to the Convention. Holder, 392 F.3d at 1013.

The Convention aims to discourage forum shopping in international custody disputes. Id. The role of the court applying the Convention is solely to determine the rights available under the Convention, as opposed to the merits of the underlying child custody claim. Id. at 1013-14; § 11601(b)(4). In other words, the court does not "determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." Mozes, 239 F.3d at 1079.

## I.  Wrongful Removal or Retention

The Convention only requires the return of a child whose removal or retention was "wrongful":

> The removal or the retention is to be considered
> wrongful where -

16- FINDINGS OF FACT AND CONCLUSIONS OF LAW

a) it is in breach of rights of custody attributed to a person...under the law of the state in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised,...or would have been so exercised but for the removal or retention.

Convention, Art. 3, 19 I.L.M. at 1501.

In determining whether the removal or retention was "wrongful" under the Convention, courts answer four questions: (1) when did the removal or retention take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the custody rights of the petitioner under the laws of the child's habitual residence? (4) was the petitioner exercising those rights at the time of the removal or retention? Mozes, 239 F.3d at 1070. The petitioner must establish that the removal or retention was "wrongful" by a preponderance of the evidence. § 11603(e)(1)(A).

## A.   Date of Retention

When one parent consents to the child staying with another, and that other person later refuses to return the child, the date of retention is that point when the noncustodial parent knows the custodial parent will not return the child.   See Zuker v. Andrews, 2 F.Supp.2d. 134, 139 (D. MA. 1998)(retention occurred when custodial parent clearly communicated her intention of not returning the child to the noncustodial parent); see also Mozes, 239 F.3d at 1070-71 (date of retention clearly the date the mother initiated custody proceedings, even though this date was prior to the end of the agreed-upon stay abroad); see also Slagenweit v.

17- FINDINGS OF FACT AND CONCLUSIONS OF LAW

<u>Slagenweit</u>, 841 F.Supp. 264, 268 (N.D. IA 1993)(date of retention
was date custodial parent filed for divorce because on that date
it was clear to all that the custodial parent did not intend to
return the child to the noncustodial parent); <u>see also</u> <u>Schroeder
v. Vigil-Escalera Perez</u>, 76 Ohio Misc.2d, 25, 33-34, 664 N.E.2d
627, 632 (1995)(citing <u>Slagenweit</u> in holding date of retention is
date custody becomes an issue).

Thus, the date of retention is August 14, 2008, the date
Gooch served Riley with the petition for dissolution of marriage.
On that date, due to the temporary restraining order, Riley
clearly knew respondents would not return ZVG.

### B.    Immediately Prior to the Retention, In Which State Was ZVG Habitually Resident?

Riley must establish, as a threshold matter, that as of
August 14, 2008, ZVG's habitual residence was Germany.  <u>Holder</u>,
392 F.3d at 1014-15.  Otherwise, the Convention does not apply as
ZVG is not retained in a state other than her state of habitual
residence.  <u>Id.</u>; <u>see also</u> Elisa Perez-Vera, Explanatory Report ¶
58, in 3 Hague Conference on Private International Law, Acts and
Documents of the Fourteenth Session, Child Abduction 426
(1982)("Perez Vera Report").[9]

///

---

[9]The Perez-Vera Report is widely known as "the official
history and commentary on the Convention and is a source of
background on the meaning of the provisions of the Convention..."
<u>Mozes</u>, 239 F.3d at 1070 (internal citations omitted).  The full
text of the Perez-Vera Report is available online at
http://www.hcch.net/index_en.php?act=publications.details&pid=2779.

Because "children...normally lack the material and psychological wherewithal to decide where they will reside[,]" courts look to the intentions of those entitled to fix the child's residence when determining the habitual residence of a child. Mozes, 239 F.3d at 1076. A young child may acquire a new habitual residence in one of two ways: (1) through the parents' shared settled intention to abandon the initial habitual residence; or (2) if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." Mozes, 239 F.3d at 1081 (internal citations omitted).

Prior to December 14, 2007, ZVG's habitual residence was clearly Germany. As described in my Findings of Fact above, Riley intended to return with ZVG to Germany 90 days after leaving. Thus, Riley and Gooch did not have the shared parental intent to abandon Germany as ZVG's habitual residence.

Additionally, the facts here do not demonstrate acclimatization sufficient to overcome the lack of shared parental intent. In Holder, the court concluded that a five-year-old child who "attended kindergarten, participated in sports programs, and accompanied his parents on various excursions" over eight months had not developed "deep rooted ties" to Germany. Holder, 392 F.3d at 1020-21. Younger children have an even more difficult time acclimatizing. See Holder, 392 F.3d at 1021-22 (recognizing that absent a shared parental intent to abandon the child's established habitual residence, "it is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize

19- FINDINGS OF FACT AND CONCLUSIONS OF LAW

independent of the immediate home environment of the parents.").

Like the children in Holder, ZVG was in the United States for exactly eight months prior to the wrongful retention. However, ZVG lacked the stability of the Holder children. During the eight months, ZVG moved on five separate occasions. At less than 13-months-old, ZVG clearly could not develop the deep-rooted ties to the United States necessary to overcome her parents' lack of shared intent to abandon Germany. Thus, Germany remained ZVG's habitual residence as of August 14, 2008.

## C.  Did the Removal or Retention Breach the Custody Rights of the Petitioner Under the Laws of the Child's Habitual Residence?

The parties stipulated that Riley had rights of custody under German law. (Joint Statement of Stipulated Facts, ¶ 30.) Under the Convention, "rights of custody" specifically include "the right to determine the child's place of residence." Convention, Art. 5(a), 19 I.L.M. at 1501. When Gooch served Riley with the temporary restraining order, he breached Riley's custody rights.

## D.  Was the Petitioner Exercising Those Rights At the Time of the Removal or Retention?

If a petitioner has valid custody rights under the laws of the child's habitual residence, he or she will exercise those rights with nearly any act "short of acts that constitute clear and unequivocal abandonment of the child." Asvesta v. Petroutsas, 580 F.3d 1000, 1018 (9th Cir. 2009) (internal citation omitted). Under the Convention, and in accordance with common sense, a parent who voluntarily sends a child to live with another has not relinquished custody rights. Baxter v. Baxter, 423 F.3d 363, 371

20 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

(3rd Cir. 2005); 51 Fed.Reg. at 10506.

As stated above in my Findings of Fact, Riley, Gooch, and the Duells intended ZVG's stay with the Duells to be temporary. Thus, Riley was exercising her custody rights at the time of retention.

## II. Affirmative Defenses

If the petitioner establishes the wrongful removal or retention of a child, the child must be promptly returned to the country of habitual residence unless the respondent establishes an affirmative defense. Convention, Art. 12, 13; § 11603(e)(2). As described above, Riley established a *prima facie* case that ZVG was wrongfully retained in the United States.

### A. The Now Settled Defense

The court is not required to order the return of the child if the petition for return was filed more than one-year from the date of wrongful removal or retention and the respondent demonstrates that the child is now settled in the new environment. Convention, Art. 12; In re B. Del C.S.B., 559 F.3d 999, 1002-3 (9th Cir. 2009). The respondent must prove the child is now settled by a preponderance of the evidence. § 11603(e)(2)(B).

Similar to the habitual residence analysis, the court inquires as to "the child's relative attachments" to the new country and then determines if those attachments are so significant as to require keeping the child in the new country. In re B. Del C.S.B., 559 F.3d at 1011 (quoting Mozes, 239 F.3d at 1081). Respondents must demonstrate "nothing less than substantial evidence of the child's significant connections to the

21- FINDINGS OF FACT AND CONCLUSIONS OF LAW

new country[.]" In re B. Del C.S.B., 559 F.3d at 1003 (quoting
Public Notice 957, Hague International Child Abduction Convention;
Text and Legal Analysis, 51 Fed.Reg. 10494, 10509 (U.S. Dep't of
State, March 26, 1986).

In determining whether a child has "significant connections
to the new country," the court considers a number of factors
including: (1) the child's age; (2) the stability and duration of
the child's residence in the new environment; (3) whether the
child attends school or day care consistently; (4) whether the
child has friends and relatives in the new area; (5) the child's
participation in community or extracurricular activities; and (6)
the respondent's employment and financial stability. In re B. Del
C.S.B., 559 F.3d at 1009. The child's stability and duration in
the new environment is generally the most important factor. Id.

Although ZVG appears to be a very happy two-year-old, the
fact remains that she is only two years old. According to Ted
Duell's testimony, as of the hearing date, ZVG could almost make
it through the ABCs. Respondents did not cite, and I could not
find, a case in which a court refused to order the return of a
two-year-old child because the child was now settled in her new
environment. Respondents cite Wojcik v. Wojcik, 959 F.Supp. 413
(E.D. MI 1997) in support of their article 12 defense. However,
Wojcik involved two children, aged five and eight. Id. at 421.
Indeed, the court in Wojcik specifically compared the result
reached there with another case, involving a three-year-old and a
one-year-old, in which that court suggested very young children

22- FINDINGS OF FACT AND CONCLUSIONS OF LAW

have trouble developing significant ties to the community and developing meaningful friendships.  See Id. (comparing David S. v. Zamira S., 151 Misc.2d 630, 574 N.Y.S.2d 429, 433 (N.Y.Fam.Ct. 1991)).

Since Zamira, other courts have noted difficulties in determining whether very young children are settled.  In Moreno v. Martin, 2008 WL 4716958 at * 21 (S.D. FL), the court concluded, *a fortiori*, "that a three-year-old child who has moved five times in just *one* and a half years is not well settled." (emphasis in original).  Although that child attended day care, the court noted that "it is questionable whether a [three-year-old child] has the developmental capacity to engage meaningfully in [regular social, community, or extracurricular activities] and be considered settled due to them."  Id.

Another court concluded a nine-year-old who completed three years in the same school and had many friends both in and out of school, was "now old enough to experience meaningful ties with the United States."  Belay v. Getachew, 272 F.Supp.2d 553, 562 (D. MD 2003).  Another court noted that while an eleven-year-old and a six-year-old were old enough to "allow meaningful connections to the new environment to evolve....children of a very young age are not."  In re Robinson, 983 F.Supp. 1339, 1345-46 (D. CO. 1997)(citing Zamira, 151 Misc.2d at 636, 574 N.Y.S.2d at 433).  In In re Robinson, the children lived in the same area for 22 months, had active involvement with respondent's extended family, were doing well in school, had made friends in and out of school, and

23- FINDINGS OF FACT AND CONCLUSIONS OF LAW

were "active participants in extracurricular activities such as
Cub Scouts, Kampus Club, hockey and soccer." 983 F.Supp. at 1346.

In Zuker, the court concluded the child, four years and two
months old when the petition was filed, was now settled.
2 F.Supp.2d at 141. That child had lived in the United States for
15 months prior to the filing of the petition. Id. at 140.
However, the respondent in Zuker submitted much more evidence than
respondents here in demonstrating that the child was now settled.
Significantly, the Zuker court noted an affidavit from the
Executive Director of the child's day care center, stating the
child "has grown and thrived academically and socially," "attends
birthday parties and playdates at his home and at the homes of his
friends[,]" and had "established relationships with teachers,
children and other staff." Id. at 141. This sort of evidence,
crucial in a case with such a young child, was entirely lacking
here.[10] More importantly, *ZVG was only half the age of the child
in Zuker* at the filing of the respective petitions.

As stated above in my Findings of Fact, ZVG attended day care
consistently since August 2008. Respondents testified ZVG enjoys
day care and has some friends. ZVG lived with the Duells, in the
same residence since July 2008. ZVG enjoys going on neighborhood
walks with the Duells. ZVG speaks English, but not German.
///

----

[10]I must note that the parties did not conduct much briefing
or discovery on the well-settled issue. This is in large part
due to the fact that respondents did not assert this affirmative
defense until three days prior to the hearing.

24 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

However, during her two years in the United States, ZVG has
moved on five separate occasions.  She has not seen her mother or
her half-brothers in 16 months.  Although Gooch has a close
relationship with ZVG, he moved out of the Duell home in March
2009.  As one would expect of a two-year old, ZVG does not partake
in any community or extracurricular activities, clubs, or sports.

I conclude that Gooch and the Duells failed to establish that
ZVG had developed such significant connections to the United
States that ordering her return to Germany would be disruptive,
with likely harmful effects.  Rather, I conclude respondents
demonstrated that ZVG is, like most two-year-olds, very adaptable.

## B.   Consent and Acquiescence

The court is not required to order the return of the child if
the respondent establishes, by a preponderance of the evidence,
that the petitioner either consented to the removal or retention,
or subsequently acquiesced to the prior interference with her
custody rights. Convention, Art. 13(a), 19 I.L.M. at 1502;
§ 11603(e)(2)(B).  Obviously, one may consent to a limited visit
without relinquishing the future right to demand the child's
return.  Wanninger v. Wanninger, 850 F.Supp. 78, 82 (D. Mass.
1994); Baxter v. Baxter, 423 F.3d 363, 371-72 (3rd Cir. 2005).
Thus, the scope, terms, and conditions of an agreed upon visit are
relevant to the consent inquiry.  Baxter, 423 F.3d at 371-72.

As stated above in my Findings of Fact, all of the parties
involved believed the Duells would watch the children for a short
time only, after which the children would be returned to Riley and

25- FINDINGS OF FACT AND CONCLUSIONS OF LAW

Gooch.  Additionally, as stated above in my Findings of Fact,
Meyer, Polson, and Clagett testified Riley's actions at the time
were not consistent with the actions of one who had consented.

To demonstrate petitioner's subsequent acquiescence, the
respondent must demonstrate "an act or statement with the
requisite formality, such as testimony in a judicial proceeding; a
convincing written renunciation of rights; or a consistent
attitude of acquiescence over a significant period of time."
Baxter, 423 F.3d at 371.  This defense requires an inquiry into
the petitioner's subjective intent.  Id.

The Duells point to the email exchange between Riley and
Bonnie Duell on November 21, 2008 as objective evidence
demonstrating Riley's acquiescence.  (Trial Brief for Resp'ts Ted
and Bonnie Duell, 20.)  As I stated in my Findings of Fact above,
I found credible Riley's testimony concerning her subjective
intent in the emails.  Considering that intent, the circumstances
involved in the retention, Riley's relationship with Bonnie Duell,
and the fact that Riley was still looking for legal assistance to
secure ZVG's return, the emails are not evidence of acquiescence.
For similar reasons, I conclude that Riley's silence for nearly
three months after the wrongful retention is understandable.

Gooch and the Duells testified that prior to leaving the
U.S., Riley never specifically requested that they return ZVG.
However, after being rebuffed by the local authorities and
subsequently served with a restraining order issued by the state
of Oregon, Riley had no further reason to request ZVG's return

26- FINDINGS OF FACT AND CONCLUSIONS OF LAW

from Gooch or the Duells directly.  Riley's relationship with the
Duells, always acrimonious, had completely deteriorated.  For
example, although by this time Riley knew the Duells would not
return ZVG, she asked Bonnie Duell to purchase plane tickets to
Germany for herself and her sons.  Bonnie Duell refused, stating
that she could not afford to pay for the divorce and the plane
tickets.  Further, Riley was in the country illegally and was
worried about the state taking her sons.  Considering the
circumstances, I do not consider the above evidence of
acquiescence.

     I also considered the testimony of Polson, Meyer, Hoover, and
Flanders.  Their testimony demonstrates that rather than
acquiescing to ZVG staying with Gooch and the Duells, Riley was
distressed with the situation and actively attempted to secure
ZVG's return.  Additionally, the fact that Riley obtained an
attorney in January 2009 to secure ZVG's return is compelling
evidence that Riley did not acquiesce.[11]  Finally, as shown in my
Findings of Fact above, Riley's tone in her emails with Bonnie
Duell changed dramatically after Riley secured an attorney.  Thus,
although Riley did not file the petition for return until one year
and 13 days after the wrongful retention, I conclude that Riley
clearly did not exhibit a "consistent attitude of acquiescence
over a significant period of time."
///

_____

     [11]As noted above, that attorney failed to advise Riley of
the Convention.

27- FINDINGS OF FACT AND CONCLUSIONS OF LAW

**C.    Grave Risk of Physical or Psychological Harm**

A court shall not order the return of a child if respondent establishes, by clear and convincing evidence, that there is a grave risk of physical or psychological harm if the child is returned. <u>Convention</u>, Art. 13(b), 19 I.L.M. at 1502. A serious risk of harm is not enough to prevent the prompt return of a wrongfully removed or retained child; the risk must be grave. <u>See</u> <u>Gaudin v. Remis</u>, 415 F.3d 1028, 1036-37 (9th. Cir. 2005)(quoting 51 Fed.Reg. at 10509). Although the living situation prior to removal may be relevant, the focus is on the situation into which the child would be returned. <u>Baxter</u>, 423 F.3d at 374.

To the extent respondents attempted to establish this affirmative defense, they failed to meet the stringent burden that returning ZVG to Riley presents a grave risk of immediate harm to ZVG. Although respondents presented evidence that Riley abused alcohol and prescription pain medication approximately 16 months ago, I do not find that to be true.

///
///
///
///
///
///
///
///
///

28- FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONCLUSION**

Riley established, by a preponderance of the evidence, that ZVG was "wrongfully retained" in the United States. Neither Gooch nor the Duells established an affirmative defense. Thus, under the Convention, I ordered ZVG's prompt return to Germany, her country of habitual residence.

DATED this __29__ Day of January, 2010.

OWEN M. PANNER
U.S. DISTRICT JUDGE

29- FINDINGS OF FACT AND CONCLUSIONS OF LAW